## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Felipe Hernández Lazo,<br><br>      Petitioner,<br><br>    -v-<br><br>Kristi Noem, in her official capacity, Secretary of the U.S. Department of Homeland Security; Pamela Bondi, in her official capacity, Attorney General of the United States; Joseph B. Edlow, Director of U.S. Citizenship and Immigration Services; Carmen Nunez, Supervisor, USCIS Long Island, New York Field Office; Patrick J. Ryder, in his official capacity, Commissioner of the Nassau County Police Department, responsible for oversight of ICE detainees held at the Nassau County Correctional Center; Errol D. Toulon, Jr., in his official capacity, Sheriff of Suffolk County, responsible for oversight of ICE detainees held at the Suffolk County Correctional Facility,<br><br>      Respondents. | 2:25-cv-6639<br>(NJC) |

## OPINION AND ORDER

NUSRAT J. CHOUDHURY, United States District Judge:

On December 1, 2025, Felipe Hernández Lazo filed this combined habeas petition under 28 U.S.C. § 2241 and civil action for injunctive and declaratory relief under the U.S. Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 701–06. Mr. Hernández Lazo challenges the lawfulness of his detention by Immigration and Customs Enforcement ("ICE") and any removal proceedings that had been or may be initiated against him by the Department of Homeland Security ("DHS"). (Pet. For Writ of Habeas Corpus & Compl. For Injunctive Relief ("Pet."), ECF No. 1.) Through the habeas petition, Mr. Hernández Lazo seeks the following relief: (1) a writ of habeas corpus requiring Respondents to immediately release Mr.

Hernández Lazo because his detention in ICE custody violates his due process rights; (2) a declaration that the "process as applied to Petitioner by Respondents violates the Suspension Clause, the Due Process Clause of the Fifth Amendment, the Fourth Amendment, the INA, the APA, and federal regulations"; and (3) a writ of habeas corpus directing Respondents to pursue a constitutionally adequate process to justify adverse immigration actions against Petitioner. (Pet. at 24–25.) Before the Court is only the petition seeking a writ of habeas corpus under 28 U.S.C. § 2241 on the grounds that ICE's detention of Mr. Hernández Lazo without notice and an opportunity to be heard violates Section 236(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1226(a) ("Section 1226(a)"), and the Due Process Clause of the Fifth Amendment to the U.S. Constitution. (Pet. ¶¶ 26–35, 59–60.)[1]

Respondents are federal government officials named in their official capacities: Kristi Noem, Secretary of the U.S. Department of Homeland Security ("DHS"); Pam Bondi, United States Attorney General; Joseph B. Edlow, Director of U.S. Citizenship and Immigration Services ("USCIS"); Carmen Nunez, Supervisor with the USCIS Long Island, New York Field Office; Patrick J. Ryder, Commissioner of the Nassau County Police Department; Errol D. Toulon, Jr., Sheriff of Suffolk County. Noem, Bondi, Edlow, and Nunez (the "Federal Respondents") argue that Mr. Hernández Lazo's detention falls under a different INA provision, 8 U.S.C. § 1225(b)(2) ("Section 1225(b)(2)"), which governs the mandatory detention of certain noncitizens who are "seeking admission" to the United States. (Mem. L. Resp. Show Cause Order ("Resp.") at 8–9, ECF No. 13.) According to Respondents, Section 1225(b)(2) requires

---

[1] On January 15, 2026, Mr. Hernández Lazo withdrew his civil action claims for injunctive and declaratory relief. (ECF No. 21.)

Mr. Hernández Lazo's detention, and he has no right to any additional process under the Due Process Clause.

Respondents are incorrect, as the vast majority of courts throughout this District, Circuit, and even the country have held in similar cases. Moreover, the conditions in which they held Mr. Hernández Lazo for around twenty-three-hours spread across December 2, 3, and 4, 2025 shock the conscience, falling below any minimum standards for ICE detention facilities.

Mr. Hernández Lazo has been living in the United States continuously since 1997—nearly 30 years. In 1999, he was granted Temporary Protected Status ("TPS"), and USCIS extended that status or granted his application to re-register for TPS at least ten times, thereby determining that Mr. Hernández Lazo did not pose any public safety risk. Mr. Hernández Lazo duly re-registered for TPS, applied for and was granted advance parole to travel abroad on numerous occasions, was granted work authorization, and applied for permanent residence and an adjustment of status. However, several months after Noem terminated TPS for Honduras effective September 8, 2025, ICE agents arrested and detained Mr. Hernández Lazo without any notice, opportunity to be heard, or individualized consideration, when Mr. Hernández Lazo appeared for an interview for his adjustment of status application.

ICE's detention of Mr. Hernández Lazo deprived him of his significant liberty interest in remaining free from detention—the paramount interest triggering the procedural due process protections of the Fifth Amendment. While ICE detained him in several different locations, they kept him in shocking conditions for around twenty-three hours in what is known as the "Central Islip Hold Room"—an ICE facility located in the Alfonse D'Amato U.S. Courthouse in Central Islip, New York. There, Mr. Hernández Lazo was one of six people locked in a small, unheated or poorly heated cell containing an open toilet that is designed for the brief detention of a single

individual. He was detained without access to a bunk, proper bedding, soap, a shower, a toothbrush, or clean clothes. These deplorable conditions are documented by witness testimony not just in this case, but in two others: *Minarcaja Concha v. Lyons*, No. 25-cv-6695, 2026 WL 215417 (E.D.N.Y. Jan. 28, 2025), and *Clarke v. U.S. Department of Homeland Security, et al.*, 2025 WL 3674471 (E.D.N.Y. Dec. 18, 2025).

These appalling conditions underscore precisely why, in our nation governed by the rule of law, due process requires notice and an opportunity to be heard to guard against the erroneous deprivation of liberty. Freedom is precious. And when at liberty, a person is not subject to being locked up in a crowded, cold room that may reek of urine from the open toilet, where the lights are kept on for twenty-four hours a day.

For the reasons explained below, Respondents' detention of Mr. Hernández Lazo is unlawful. The detention is governed by Section 1226(a)—not Section 1225(b)(2) or any other INA provision requiring mandatory detention—based on the plain text of these statutory provisions. Neither at the time of his arrest, nor at any point thereafter, was Mr. Hernández Lazo subject to mandatory detention under Section 1225(b)(2) as a noncitizen who, among other things, was "seeking admission" to the United States. Moreover, Mr. Hernández Lazo's regular applications for extension or re-registration of his TPS were predicated on his submission of information showing that he had not been arrested, cited, charged, indicted, fined, or imprisoned for breaking or violating any law, excluding minor traffic violations, among other things. Mr. Hernández Lazo has absolutely no criminal record in the United States whatsoever, and nothing in the record suggests that he poses a public safety or flight risk. Rather, Mr. Hernández Lazo has resided in the United States for nearly thirty years and has been a productive member of the community, working in construction with authorization from the federal government. Although

4

Noem terminated TPS for *all* Honduran nationals, that termination does not suddenly transform Mr. Hernández Lazo into a non-citizen "seeking admission" to the United States under Section 1225(b)(2).

Respondents provided Mr. Hernández Lazo no notice or opportunity to be heard prior to his sudden arrest and detention, much less the minimum requirements of an individualized determination by a DHS officer that he posed a flight or safety risk. In light of Mr. Hernández Lazo's significant interest in physical liberty—even as a noncitizen subject to discretionary detention under Section 1226(a)—the high risk of erroneous deprivation resulting from detention without notice or opportunity to be heard, and the government's failure to show that Mr. Hernández Lazo's detention is needed to protect public safety or guard against any flight risk, Respondents' detention of Mr. Hernández Lazo without any notice or opportunity to be heard is a violation of his Fifth Amendment right to procedural due process. The petition for a writ of habeas corpus is therefore granted.[2]

## BACKGROUND

### I. Factual Background

#### A. Mr. Hernández Lazo's Entry into the United States and Temporary Protected Status

Mr. Hernández Lazo, a Honduran national, entered the United States for purposes of this action in around January of 1997. (Supp. Decl. of Tony Petito ("Second Petito Decl.") ¶ 7, ECF

---

[2] The Court granted the Petition orally on December 12, 2025, providing its reasons on the record and noting that a more detailed written opinion would follow. (Hr'g Tr. 39:2–53:1.) This Opinion and Order provides the Court's full analysis.

No. 13-1; Pet. ¶ 14; Notice to Appear, Dec. 2, 2025 ("2025 NTA"), ECF No. 18-1 at 7.)[3] Over

the course of the next year, Mr. Hernández Lazo left and returned to the United States several

times. (Second Petito Decl. ¶¶ 8–11.)

On December 21, 1999, the Immigration and Naturalization Service ("INS")—the

predecessor to ICE—granted Mr. Hernández Lazo, as a Honduran national, Temporary Protected

Status through July 5, 2000. (*Id.* ¶ 12.) Between 2000 and September 25, 2025, USCIS extended

the TPS designation or granted Mr. Hernández Lazo's application to re-register for TPS at least

ten times. (*Id.* ¶¶ 13–17, 20, 27, 28, 32–35.) The record contains several of these applications,

which show that Mr. Hernández Lazo reported to USCIS that he had not been arrested, cited,

charged, indicted, fined, or imprisoned for breaking or violating any law, excluding minor traffic

violations. (*See, e.g.*, ECF No. 18-1 at 82.) During that same 25-year period, USCIS also

authorized Mr. Hernández Lazo to travel abroad and re-enter the United States under advance

parole on numerous occasions. (Second Petito Decl. ¶¶ 18–31.)[4] Each of these trips abroad were

brief, lasting anywhere from a few weeks to a few months. (*Id.*)

---

[3] Although not material to the issues here, Mr. Hernández Lazo had previously entered the country on February 17, 1988, applied for and was denied asylum, and departed the United States in 1992 after it was determined that he had overstayed. (Second Petito Decl. ¶ 4–6.)

[4] The record reflects that Mr. Hernández Lazo has lived in the United States since 1997, aside from brief trips abroad, most, if not all of them, taken with advance parole. On one occasion— when Mr. Hernández Lazo traveled abroad from December 31, 2009 to March 26, 2010—the record does not reflect whether Mr. Hernández Lazo received authorization before departing the United States, but evidence shows that DHS paroled him back into the United States upon his return. (Second Petito Decl. ¶¶ 18–19.)

Since January 2005, Mr. Hernández Lazo has lived at an address in Mastic, New York. (ECF No. 18-1 at 28.) He has not resided outside of the United States since 1997. (*Id.* at 28–29.)[5]

USCIS most recently approved Mr. Hernández Lazo's TPS registration on February 26, 2024. (ECF No. 18-1 at 52.) That approval was valid from January 6, 2024 through July 5, 2025. (*Id.*) With TPS, Mr. Hernández Lazo was authorized to work and "considered as being in, and maintaining, lawful status" for purposes of adjustment of status. ECF 18-1 at 52; *see also* 8 C.F.R. § 244.12(a) ("Upon approval of an application for Temporary Protected Status, USCIS shall grant an employment authorization document . . . ."). There is no evidence in the record showing that this work authorization was terminated by virtue of Noem's September 2025 termination of TPS for all Honduran nationals. *See* 8 C.F.R. § 244.12(b) (providing that if a noncitizen's TPS is withdrawn, employment authorization expires upon the date of the notice of withdrawal or the date on the employment authorization document, whichever is later).[6]

Since being granted TPS, Mr. Hernandez Lazo has worked as a carpenter for a construction company. He has a U.S. citizen daughter who is 22 years old and resides with him in New York. (ECF No. 18-1 at 13.)

---

[5]  The record shows that Mr. Hernández Lazo last resided outside of the United States in Honduras from 1966 to 1997. (ECF No. 18-1 at 28–29.) Petito does not provide any facts to the contrary. (*See* Second Petito Dec. ¶¶ 11–18.) This Court provided Respondents ample opportunities to submit evidence concerning such issues. (*See* Elec. Orders, Dec. 8, 2025, Dec. 10, 2025.)

[6] While on TPS, Mr. Hernández Lazo could not "depart the United States without prior approval of the Attorney General of the United States." (ECF 18-1 at 52.)

B.  Termination of TPS and Application for Adjustment of Status

On July 8, 2025, Noem published a federal registrar notice that terminated TPS for Honduras effective September 8, 2025. *See* 90 Fed. Reg. 30089–92.[7] In the meantime, on or around August 16, 2025, Mr. Hernández Lazo applied for an adjustment of status by submitting a Form I-485 to Register Permanent Residence or Adjust Status along with his daughter's submission of a Form I-130, Petition for Alien Relative. (Second Petito Decl. ¶ 36; Pet. ¶ 16; Pet., Ex. A.)

As of the date of the Form I-485, Mr. Hernández Lazo had never been placed in removal proceedings since entering the United States in 1997. (ECF No. 18-1 at 39–40.) As noted, he has no criminal record in the United States whatsoever.

On September 25, 2025, while Mr. Hernández Lazo's application for adjustment of status was pending, USCIS terminated his TPS. (Second Petito Decl. ¶ 35.)[8] USCIS did not provide any notice to Mr. Hernández Lazo of the termination. (Pet. ¶ 14.)

---

[7] On July 31, 2025, a court in the Northern District of California ordered the termination of TPS for Honduras postponed "to preserve the status quo and until a hearing on the merits" scheduled for November 18, 2025. *Nat'l TPS All. v. Noem*, 798 F.Supp.3d 1008, 1015 (N.D. Cal. 2025). However, on August 20, 2025, the Ninth Circuit stayed the District Court's July 31, 2025 order pending further order of the Ninth Circuit, while district court proceedings continued. *Nat'l TPS All. v. Noem*, No. 25-4901-cv (9th Cir. Aug. 20, 2025).

[8] Respondents' opposition to the Petition did not provide any admissible evidence showing that USCIS had terminated Mr. Hernández Lazo's TPS, because, as set forth below, the Petito Declaration consists entirely of hearsay statements based not on personal knowledge, but on information gathered from unidentified sources and persons. The Court ordered Respondents to produce "any documents relating to the termination of Petitioner's TPS status on September 25, 2025." (Elec. Order, Dec. 10, 2025.) In response, Respondents provide what appears to be a screenshot of an online USCIS "Case Status" search tool with the search input, "EAC123456890" and output, "[t]he TPS designation associated with your Receipt Number IOE0923552977 has been terminated by Federal Register Notice." (ECF No. 18-1 at 54.) The

On December 1, 2025 Mr. Hernández Lazo appeared on time with his attorney for an interview in support of his application for adjustment of status. (*Id*. ¶ 17.) He waited for nearly three hours for USCIS to begin the interview. Although it started late, USCIS conducted the interview. (*Id.*) There is a factual dispute as to the events that followed.

The Petition alleges that near the conclusion of the interview, but before it had ended, the interviewer invited ICE agents into the "private room where the interview was being conducted." (*Id.* ¶ 18.) According to the Petition, the ICE agents "refused to provide [Mr. Hernández Lazo's] counsel with any warrant or Form I-200, despite repeated requests." (*Id.*) By contrast, the Federal Respondents provide a declaration from Tony Petito, an ICE Supervisory Detention and Deportation Officer, consisting of hearsay statements based not on personal knowledge, but on information gathered from unidentified sources and persons. (*See* Second Petito Decl. ¶ 2 ("[T]he following representations are based on my review of Petitioner's administrative file, consultation with colleagues, and ICE's electronic records and databases.").) Petito asserts that "ICE Officers arrested [Hernández Lazo] outside the USCIS office," although he was not present during these events and fails to identify either the sources or individuals on which he relies for such hearsay. (Petito Decl. ¶ 37.)

---

printout does not list Mr. Hernández Lazo's name or the date of termination, but Receipt Number IOE0923552977 appears on Mr. Hernández Lazo's TPS approval notice. (*See id.* at 52.)

Nonetheless, the record reflects that Mr. Hernández Lazo's TPS is no longer in effect. Under 8 C.F.R. § 244.19, nationals afforded TPS lose that designation "upon the sixtieth [] day after the date notice of termination is published in the Federal Register . . . automatically and without further notice or right of appeal," and Noem published the termination on July 8, 2025. 8 C.F.R. § 244.19. Moreover, the district court's decision in *National TPS Alliance* is stayed. *Natl' TPS All.*, No. 25-4901-cv (9th Cir. Aug. 20, 2025). Mr. Hernández Lazo does not contest that he "no longer holds TPS." (Reply at 20.)

Nevertheless, Hernández Lazo and the Federal Respondents agree that following the arrest, ICE agents detained Hernández Lazo, purportedly "pursuant to . . . 8 U.S.C. § 1225(b)(2)(A)." (Second Petito Decl. ¶ 37; *see also* Hr'g Tr. 27:16–28:4.)

### C. Detention in the Central Islip Hold Room and Other Facilities

Following the arrest, ICE transported Mr. Hernández Lazo "for processing" to the Central Islip Hold Room located at 535 Federal Plaza, New York, New York in the Alfonse D'Amato U.S. Courthouse. (Decl. of Tony Decl ("First Petito Decl.") ¶ 2, ECF No. 10-1.) He was detained there on two separate occasions, once for nine hours and later for another fourteen hours. (First Petito Decl. ¶¶ 2–3, 5–6.)

ICE initially transported Mr. Hernández Lazo to the Central Islip Hold Room at around 12:22 a.m. on December 2, 2025, and kept him there until around 9:24 a.m., when they transferred him to the Nassau County Correctional Center (the "Nassau County Jail"). (First Petito Decl. ¶ 2.) Sometime that same day, DHS issued Mr. Hernández Lazo a Notice to Appear ("NTA") initiating removal proceedings against him on the grounds that he is "an alien present in the United States who has not been admitted or paroled." (ECF No. 18-1 at 7.)

ICE returned Mr. Hernández Lazo to the Central Islip Hold Room at around 11:38 a.m. on December 3, 2025, because they had been unable to secure "permanent placement [for him] at an ICE detention facility." (First Petito Decl. ¶ 5.) He remained in the Central Islip Hold Room until around 1:20 a.m. on December 4, 2025, when he was transported to ICE's Delaney Hall Detention Facility in Newark, New Jersey. (*Id.* ¶¶ 5–6.)

Mr. Hernández Lazo appeared in person at the December 12, 2025 hearing on his habeas petition and testified before the undersigned about his detention in the Central Islip Hold Room

with the assistance of a Spanish-language interpreter. (*See* Hr'g Tr. 7:3–19:14.)[9] The Court finds his testimony to be credible.

When Mr. Hernández Lazo arrived at Central Islip Hold Room, ICE did not tell him how long he would be detained there. (Hr'g Tr. 7:12–14, 19–20.) On both occasions on which he was detained in the facility, Mr. Hernández Lazo was held with five other men in what he estimated to be a six foot by six foot "cell." (Hr'g Tr. 7:22-8:1, 8:6–13, 18–24.) During the day, the six men sat on cushions and at night they slept "[c]lose, one right next to each other," without sheets, on three-inch thick "mattress[es] that you fold in three." (*Id.* 9:4–5, 11–20.) There was a toilet in the room, "right there where [the men] sle[pt]," so the men had to position themselves such that they were sleeping on all sides of the toilet. (*Id.* 10:8–11:8.) The cell in which he was detained was not cleaned on either of the two occasions in which Mr. Hernández Lazo was detained in the Central Islip Hold Room, and the cell "smelled like pee pee, all of it." (*Id.* 10:8–13, 11:13–14.)

The lights were kept on during the entirety of Mr. Hernández Lazo's detention in the Central Islip Hold Room. Lights were not turned off so the men could sleep, even though Mr. Hernández Lazo was detained during nighttime hours: from around 12:22 a.m. to around 9:24 a.m. on December 2, 2025, and from around 11:38 a.m. on December 3, 2025 to around 1:20 a.m. on December 4, 2025. (*Id.* 9:21–10:3; ECF No. 10-1 ¶¶ 2–3, 5–6.)[10]

---

[9] At the hearing, Respondents stated that they did not have any objections to the Court asking Mr. Hernández Lazo questions. (Hr'g Tr. 7:3–6.) Neither party requested that Mr. Hernández Lazo be placed under oath. Without objection, the Court relied on Mr. Hernández Lazo's unsworn statements about certain factual matters during the hearing.

[10] Petito refers to specific times at which Mr. Hernández Lazo was "booked into the Central Islip hold room" or another facility and to times at which he "was transferred" to a facility without defining these terms or referencing the sources or records on which he relies. (*See, e.g.*, Petito Decl. ¶¶ 2–7.)

With respect to food and hygiene at the Central Islip Hold Room, Mr. Hernández Lazo was fed rice and beans "out of a bag of food." (Hr'g Tr. 11:23–25.) When he and his cell mates needed water, they would knock on the door and would be given water. (*Id.* 11:15–22.) Although the toilet had a built-in sink, Mr. Hernández Lazo was not provided with soap, toothpaste, a toothbrush, or other hygiene products. (*Id*. 12:24–13:10.) Mr. Hernández Lazo was not able to brush his teeth or change into clean clothes for the first 48 hours of his detention in ICE custody, from the time he was first detained in the Central Islip Hold Room just after midnight on December 2, 2025, until his arrival at Delaney Hall at around 1:20 a.m. on December 4, 2025. (*Id.* 13:11–23, 14:3–13.) Neither of the cells in which he was detained in the Central Islip Hold Room had a shower, and he was not provided access to a shower when detained in the Central Islip Hold Room. (*Id.* 12:21-23.)

ICE permitted Mr. Hernández Lazo to make one call to his family when he was first arrested, but did not permit any additional calls, including a call to his lawyer, at any time during his confinement in the Central Islip Hold Room. (*Id.* 14:14–25, 15:1–24.) After his one call to family, Mr. Hernández Lazo was unable to speak with family again until he was transported to Delaney Hall in New Jersey, more than 48 hours later. (*Id.*) Mr. Hernández Lazo's family were not permitted to visit him in the Central Islip Hold Room. (*Id.* 16:7–15.)

Mr. Hernández Lazo is treated with blood pressure medication, but ICE did not give him his medication during either of his stays at the Central Islip Hold Room. (*Id.* 16:24–17.) When ICE transferred him to the Nassau County Jail after his first period of detention in the Central Islip Hold Room, a check-up revealed that Mr. Hernández Lazo was experiencing symptoms of high blood pressure and he received a reading of "200." (*Id.* 17:2–18, 19:3–15.) The facility "did a cardio and . . . an x-ray because [his] blood pressure was so high" and gave him medication to

lower his blood pressure. (*Id.* 17:13–18, 18:8–18.) Nonetheless, when ICE transferred Mr. Hernández Lazo back to the Central Islip Hold Room on December 3, 2025, ICE again did not provide him with his blood pressure medication. (*Id.* 17:9–12.) Mr. Hernández Lazo alerted staff when he arrived at the Central Islip Hold Room that he took blood pressure medication, but none was provided. (*Id.* 19:12–15.)

Mr. Hernández Lazo's testimony about the detention conditions in the Central Islip Hold Room is corroborated by two other ICE detainees who were detained there during the same time period and who testified in court proceedings on December 11 and 12, 2025 in the Alfonse D'Amato U.S. Courthouse before the undersigned and Judge Gary Brown. The testimony of these other ICE detainees corroborates Mr. Hernández Lazo's testimony about conditions in the Central Islip Hold Room.

ICE detained Mr. Minarcaja Concha in the Central Islip Hold Room for around twenty-four hours, starting at around 10:10 a.m. on December 3, 2025 and ending at around 10:00 a.m. on December 4, 2025. *Id.* at *5.[11] During processing in the Central Hold Room, ICE permitted Mr. Minarcaja Concha to make one phone call, which he used to call his wife and request that she contact his attorney. *Id.* ICE did not permit Mr. Minarcaja Concha to make another phone call to speak directly with his attorney. *Id.* His family was not permitted to visit. *Id.* An

---

[11] In *Minarcaja Concha*, Dennis Alexander Minarcaja Concha appeared by telephone at the December 12, 2025 hearing on his habeas petition and testified before this Court with the assistance of a Spanish-language interpreter about the conditions of his detention in the Central Islip Hold Room. 2026 WL 215417, at *5 & n.6. At the hearing, Respondents stated that they did not object to the Court asking Mr. Minarcaja Concha questions. *Minarcaja Concha*, 2026 WL 215417, at *5 n.6. Neither party requested that Mr. Minarcaja Concha be placed under oath. Without objection, the Court relied on Mr. Minarcaja Concha's unsworn statements about certain factual matters during the hearing.

interpreter was not present, although one of the ICE officers who detained him spoke "a little" Spanish. *Id*.

Mr. Minarcaja Concha estimates that there are around four different rooms for detainees in the Central Islip Hold Room. *Id*. ICE detained Mr. Minarcaja Concha with "about seven or eight people" total in a room that he estimates was around four feet by four feet in size. *Id.* The conditions of detention mirror those experienced by Mr. Hernandez Lazo. Mr. Minarcaja Concha's room contained a toilet and a sink, which were in view of the other detainees and were not sectioned off from the area where detained persons sat, slept, and ate. *Id*. ICE did not provide Mr. Minarcaja Concha with a blanket, pillow, mat to sleep on, a clean change of clothing, or any hygiene products, such as hand soap, toothpaste, or a toothbrush. *Id*. The room did not have a shower and Mr. Minarcaja Concha was not provided access to a shower during his detention in the Central Islip Hold Room. *Id*. ICE officers provided meals and bottled water around usual mealtimes in the morning, afternoon, and evening. *Id*. The lights remained on during Mr. Minarcaja Concha's twenty-four hours in the room and were not turned off at any point to allow detained persons to sleep. *Id*.

Erron Anthony Clarke described substantially similar experiences in the Central Islip Hold Room when he was detained there on December 5 to December 6, 2025 and again from December 9 to December 10, 2025. *Clarke*, 2025 WL 3674471, at *3. Like Mr. Hernández Lazo, Mr. Clarke was held in the Central Islip Hold Room on two separate occasions—the second of which exceeded 36 hours. *Id*. Mr. Clarke was confined to a single-occupancy room with eight other men. *Id*. Mr. Clarke, like the petitioners before the undersigned, stated that the facility had no shower facilities and no beds, that detainees "had to lie straight on the ground," and that ICE did not provide changes of clothing or toothbrushes. *Id.* Despite being detained overnight—

including for a period of time that exceeded 36 hours—Mr. Clarke testified that the lights remained on "[a]ll night, all day," and that the nights were "cold." *Id.*

In response to the Court's order requiring Respondents to address conditions in the Central Islip Hold Room, Respondents provided another declaration from Tony Petito, which consists of hearsay statements based not on personal knowledge, but on information gathered from unidentified sources and persons. (*See* Second Supp. Decl. of Tony Petito ("Third Petito Decl.") ¶ 1, ECF No. 18-1 at 1–5 ("The following representations are based on my review of Petitioner's administrative file, and consultation with my colleagues.").) Petito attests to the following without identifying the sources of his information:

> 5. By way of background ICE Hold Room facilities such as the one in Central Islip are temporary areas used for post-arrest processing including fingerprinting, completing paperwork, and making transport and bedspace arrangements at long-term detention facilities. Currently, absent extraordinary circumstances, ICE detainees are not kept at Hold Rooms beyond seventy-two hours, and most detainees are transferred out of the Central Islip Hold Room within twenty-four hours.

> 6. Detainees in the Central Islip Hold Room are interviewed during arrest processing to determine if they have any medical issues. For any medical issues arising at the Hold Room, detainees are transported to local hospitals for further evaluation and treatment. For detainees requiring medication or special accommodation, ICE arranges placement in a facility that can medically accommodate their needs and can administer medication.

> . . .

> 8. ICE provides detainees with mats to rest on and a change of clothes as needed and/or requested.

> 9. Detainees are provided with phone calls upon arrival and ICE allows additional calls as/if needed. As the facility is a short-term processing space, ICE does not have facilities to accommodate in-person family or attorney visitation.

> 10. Detainees in the Central Islip Hold Room have bathroom access. As a temporary arrest processing space, it does not have showers.

(*Id.* ¶¶ 5–6, 8–10.)

## II.    Procedural History

As noted, on December 1, 2025, Petitioner's counsel filed the combined habeas petition and civil action for injunctive and declaratory relief. (*See* Pet.) On December 2, 2025, the Court issued the Order to Show Cause, which among other things, ordered that Respondents show cause why the Petition should not be granted and barred Mr. Hernández Lazo's removal from the United States and transfer out of the Eastern District of New York, the Southern District of New York, or the District of New Jersey absent further order of this Court. (Order to Show Cause at 2–3.) That same day, the Court ordered the parties to appear for a telephone conference on December 3, 2025 to address scheduling and case management matters. (Elec. Order, Dec. 2, 2025.)

During the December 3, 2025 teleconference with the Court, counsel for Mr. Hernández Lazo represented that a search of the ICE Online Detainee Locator System on or around December 2, 2025 indicated that Mr. Hernández Lazo was located in Broome County, New York, which is located in the Northern District of New York. (Elec. Order, Dec. 3, 2025.) Counsel for Respondents represented that Mr. Hernández Lazo had never been moved outside of the Districts identified in the Court's Order, and that Mr. Hernández Lazo was being held in the Central Islip Hold Room. (*Id.*; Min. Entry, Dec. 3, 2025.) The Court then heard from the parties regarding the relief being sought by Mr. Hernández Lazo and ordered the parties to meet and confer regarding a briefing schedule on the claims brought in Mr. Hernández Lazo's civil action. (Min. Entry, Dec. 3, 2025.) The Court also advised the parties of the decision in *National TPS Alliance v. Noem*, 798 F.Supp.3d 1008, 1015 (N.D. Cal. 2025), *appeal docketed*, No. 25-4901 (9th Cir. Aug. 4, 2025), which postponed the termination of the TPS Designation for Honduras.

The Court directed the parties to address in their submissions on the Petition the relevance, if any, of *National TPS Alliance* on the claims and defenses in this action. (*Id.*)

Following the telephone conference, the Court issued an order directing Respondents to file a submission addressing where Mr. Hernández Lazo was presently detained and the authority, if any, for Respondents to detain Mr. Hernández Lazo in the Central Islip Hold Room overnight. (Elec. Order, Dec. 3, 2025.) On December 4, 2025, Respondents addressed these issues in a letter accompanied by the first Petito Declaration. (ECF No. 10; First Petito Decl.)

On December 5, 2025, the Court issued an Order to Produce, requiring the Federal Respondents to bring Mr. Hernández Lazo "under safe and secure custody" before this Court for the Show Cause hearing on December 12, 2025. (Order to Produce, ECF No. 11, at 1.) Additionally, based on the Court's review of the First Petito Declaration, on December 8, 2025, the Court required Respondents to file supplemental submissions addressing several issues, including what sleeping accommodations, food, access to showers and bathroom facilities, access to medications, medical screening, counsel, and family visitation were provided to Mr. Hernández Lazo during the time he was detained in the Central Islip Hold Room. (Elec. Order, Dec. 8, 2025.)

Respondents submitted their opposition to the Petition on December 9, 2025, and attached the Second Petito Declaration. (*See* Resp.; Second Petito Decl.) Although the Response and Second Petito Declaration referred to certain documents, neither attached any of those documents as exhibits. (*See id*.) Therefore, upon review of Respondents' response to the Petition, on December 10, 2025, the Court required Respondents to file a supplemental submission providing several categories of documents referenced in the Second Petito Declaration. (Elec.

Order, Dec. 10, 2025.) Mr. Hernández Lazo submitted a reply the next day. (Reply, ECF No. 14.)

On December 11, 2025, Respondents filed two letters, accompanied by the Third Petito Declaration, which address Mr. Hernández Lazo's detention in the Central Islip Hold Room and the records Respondents had been ordered to produce. (ECF Nos. 18–19; Third Petito Decl.) Attached as exhibits, Respondents produced:

- a December 2, 2025 Notice to Appear relating to Mr. Hernández Lazo (ECF No. 18-1 at 7–10);
- Mr. Hernández Lazo's Form I-130 Application and Approval (*id.* at 11–24);
- Mr. Hernández Lazo's Form I-485 Application and an August 19, 2025 "USCIS Account Access Notice" acknowledging USCIS's receipt of the Form I-485 Application on August 14, 2025 (*id.* at 26–50);
- a February 26, 2024 TPS Approval for Mr. Hernández Lazo and a December 11, 2025 printout of the USCIS "Case Status Online" portal reporting the termination of TPS for "Receipt Number IOE0923552977" (*id.* at 52–53);
- two parole approvals, dated March 21, 2016 and October 15, 2012, authorizing Mr. Hernández Lazo to "return to the United States [from abroad] to resume his . . . TPS" (*id.* at 56–57); and
- four applications by Mr. Hernandez Lazo to renew his TPS dated: December 28, 2017; June 13, 2016; December 6, 2014; and May 11, 2013 (*id.* at 58–98).

Petito attested that "unfortunately we were not able to locate" Mr. Hernández Lazo's initial TPS application. (Third Petito Decl. ¶ 14.)

The Court held a hearing on Mr. Hernández Lazo's habeas petition on December 12, 2025. (Min. Entry & Order, Dec. 12, 2025, ECF No. 22.) At the hearing, the Court heard Mr. Hernández Lazo's testimony about his detention in the Central Islip Hold Room and argument from counsel for the parties. (*Id.*) Considering the parties' written and oral arguments and submissions, the Court granted Mr. Hernández Lazo habeas relief for the reasons explained on the record, which the Court indicated would be set forth in more detail in this written Opinion and Order. (*Id.*) The Court further ordered Respondents to immediately release Mr. Hernández Lazo pursuant to the procedures to which the parties agreed on the record. (*Id.*; Hr'g Tr. 55:10–

58:20.) The Court did not rule on Mr. Hernández Lazo's civil action for injunctive and declaratory relief, and instead issued a briefing schedule on those claims. (*Id.*; Elec. Order, Dec. 12, 2025.) On January 15, 2025, Mr. Hernández Lazo filed a letter withdrawing his civil action claims for injunctive and declaratory relief. (ECF No. 21.)

## LEGAL STANDARD

The Petition for a writ of habeas corpus is filed under 28 U.S.C. § 2241, which "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)); *see also Hechavarria v. Sessions*, 891 F.3d 49, 53 (2d Cir. 2018). Federal courts have jurisdiction to hear habeas corpus claims by noncitizens challenging the constitutionality of their detention. *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020); *see also Hechavarria*, 891 F.3d at 53 ("[A]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest."). Additionally, "[c]laims that the discretionary process [used to detain someone] . . . was constitutionally flawed are cognizable in federal court on habeas because they fit comfortably within the scope of § 2241." *Velasco Lopez*, 978 F.3d at 850.

## DISCUSSION

As noted, the Court incorporates by reference the entirety of its Opinion and Order in *Rodriguez-Acurio v. Almodovar*, __ F. Supp. 3d __, No. 25-cv-6065, 2025 WL 3314420 (E.D.N.Y. Nov. 28, 2025), *appeal docketed*, No. 26-219 (2d. Cir. Feb. 2, 2026), and provides this additional analysis to explain the relevance of specific facts in the record relating to Mr. Hernández Lazo. The Court also notes that since its decision in *Rodriguez-Acurio*, the first

Court of Appeals decision to weigh in preliminarily on the interpretation of Section 1225(b)(2) that Respondents advanced here has tentatively rejected Respondents' argument:

> [T]he mandatory detention provision upon which Defendants rely, limits its scope to an "applicant for admission" who is "seeking admission," § 1225(b)(2)(A). Put another way, "U.S. immigration law authorizes the Government to detain certain aliens *seeking admission* into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c)."

*Castanon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1061 (7th Cir. 2025) (emphasis in original, quoting *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018)).

## I.     Statutory Framework

As noted, the Court's detailed opinion in *Rodriguez-Acurio v. Almodovar* is entirely incorporated by reference, including the Court's explanation of the statutory framework for removing noncitizens from the United States through removal and expedited removal proceedings, ICE's mandatory and discretionary detention of noncitizens under the INA, and the release of applicants for admission detained under 8 U.S.C. § 1225(b)(1) or (b)(2) "temporarily . . . [on parole] for urgent humanitarian reasons or significant public benefit" pursuant to 8 U.S.C. § 1182(d)(5)(A), which is known as the humanitarian parole statute ("Section 1182(d)(5)(A)"). *See Rodriguez-Acurio*, 2025 WL 3314420, at *8–11.

## II.     Analysis

The Petition seeks a writ of habeas corpus and order requiring Petitioner's "immediate release." (Pet. at 24.) It argues that ICE's detention violates Mr. Hernández Lazo's right to procedural and substantive due process because he was arrested and detained by ICE without notice and an opportunity to be heard, in violation of the Fifth Amendment to the U.S. Constitution. (*Id.* ¶ 60.) Mr. Hernández Lazo maintains that he never received an "individualized custody determination" by DHS. (*Id.*)

Respondents argue that the detention is lawful for two reasons. First, they contend that Mr. Hernández Lazo's detention is governed by the mandatory detention provision of Section 1225(b)(2), not the Section 1226 discretionary detention framework, and that under the "entry fiction," Mr. Hernández Lazo has no right to any additional process than what Section 1225(b)(2) affords. (Resp. at 9–23.) And second, Respondents contend that Mr. Hernández Lazo's arguments against his detention amount to a request to "equitably estop" ICE from detaining him under Section 1225(b)(2). (*Id.* at 23–25.)[12] For the reasons explained below, contrary to Respondents' contentions, Mr. Hernández Lazo's detention does not fall under the mandatory detention provision of Section 1225(b)(2) based on the statutory text. As addressed in detail in *Rodriguez-Acurio*, Respondents' framing of this Court's reasoning as one premised on the doctrine of "equitable estoppel" is inaccurate. *See Rodriguez-Acurio*, 2025 WL 3314420, at *18 n.10. Accordingly, Mr. Hernández Lazo is necessarily detained pursuant to Section 1226(a), and his detention by ICE without any notice or opportunity to be heard violates his rights to procedural due process under the Fifth Amendment. Considering Mr. Hernández Lazo's weighty liberty interests alongside Respondents' interests in enforcing immigration laws and the substantial risk of erroneous deprivation stemming from Respondents' arrest and detention of Mr. Hernández Lazo without any notice or opportunity to be heard, Mr. Hernández Lazo's detention violates his right to procedural due process.

---

[12] Respondents also addressed questions raised by the Court regarding the applicability of *National TPS Alliance*, 798 F.Supp.3d at 1015 and *Maldonado Bautista v. Santacruz*, No. 5:25-cv-1873, 2025 WL 3288403 (C.D. Cal. Nov. 25, 2025), *reconsideration granted in part*, No. 5:25-cv-01873, 2025 WL 3713982 (C.D. Cal. Dec. 18, 2025), *and amended and superseded on reconsideration*, No. 5:25-cv-01873, 2025 WL 3713987 (C.D. Cal. Dec. 18, 2025), *judgment entered sub nom. Maldonado Bautista v. Noem*, No. 5:25-cv-01873, 2025 WL 3678485 (C.D. Cal. Dec. 18, 2025) to this action. (Resp. at 25–29.) However, the parties agree that neither case is applicable here. (*See id.*; Reply at 15–16, 18–19.) The Court agrees.

A.  Mr. Hernández Lazo is Detained Under Section 1226(a), not Section 1225(b)(2)

Respondents invoke Section 1225(b)(2) as a basis for Mr. Hernández Lazo's detention, arguing that he "falls squarely within the ambit" of the statute's mandatory detention requirement. (Resp. at 11.)

Section 1225(b)(2)(A) provides that "in the case of an alien who is *an applicant for admission*, if the examining immigration officer determines that an alien *seeking admission* is not *clearly and beyond a doubt entitled to be admitted*, the alien shall be detained for a proceeding under section 1229a." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). As other courts have recognized, this language requires that "several conditions must be met" to impose mandatory detention under Section 1225(b)(2). *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 487 (S.D.N.Y. 2025). The noncitizen must be: "(1) an applicant for admission; (2) seeking admission; and (3) not clearly and beyond a doubt entitled to be admitted." *Id.*; *Martinez v. Hyde*, 792 F. Supp. 3d 211, 214 (D. Mass. 2025). It is undisputed that Mr. Hernández Lazo is "an applicant for admission" and that he is "not clearly and beyond a doubt entitled to be admitted."[13] Instead, the question here is whether he is "seeking admission" such that he is subject to mandatory detention under Section 1225(b)(2)(A).

This Court finds that he is not. Mr. Hernández Lazo cannot be "seeking admission" because he clearly is not presenting himself at the border and was not recently apprehended just after entering this country. Aside from brief trips abroad, most of them taken with advance parole, Mr. Hernández Lazo has been living in the United States since around 1997. (Pet. ¶ 14;

---

[13] *See Sanchez v. Mayorkas*, 593 U.S. 409, 416 (2021) (holding that the TPS statute permits a noncitizen to remain in the United States, but "does not constructively 'admit' a TPS recipient— that is, 'consider [ ]' him as having entered the country 'after inspection and authorization'").

Second Petito Decl. ¶ 7–31.) Respondents do not identify any active process of seeking admission attributable to Mr. Hernández Lazo. While he does have an application for permanent residence pending, just as the petitioner in *Rodriguez-Acurio* had a pending application for asylum, such an application only demonstrates that Mr. Hernández Lazo seeks "a lawful means to remain here," "not 'admission' or 'lawful entry' to the United States." *Rodriguez-Acurio*, 2025 WL 3314420, at *22.

Respondents argue that because Mr. Hernández Lazo is an "applicant for admission," he is "inherently and necessarily 'seeking admission,'" and that he therefore satisfies all three Section 1225(b)(2) criteria. (Resp. at 15.) This Court has already addressed and rejected Respondents' interpretation in *Rodriguez-Acurio*, 2025 WL 3314420, at *22–23, including Respondents' invocation of *Jennings v. Rodriguez*, 583 U.S. 281 (2018).

Respondents make no effort to distinguish *Rodriguez-Acurio* or the hundreds of district court decisions rejecting their interpretation of Section 1225(b)(2) from this action other than to point to the termination of Mr. Hernández Lazo's TPS. Yet, when asked about the legal significance of the termination of Mr. Hernández Lazo's TPS, Respondents asserted only that Mr. Hernández Lazo was "no longer in the country legally at [the] point [that his TPS status was terminated]," and that this sole fact rendered him a noncitizen who was necessarily "seeking admission" (Hr'g Tr. 28:11–30:5.)

This argument entirely fails to grapple with the plain text of Section 1225(b)(2), which as explained in *Rodriguez-Acurio*, requires some active process of seeking admission. Courts have concluded that the termination of TPS does not render a noncitizen a person seeking admission to the United States such that they are subject to mandatory detention under Section 1225(b)(2). *See, e.g.*, *Francois v. Noem*, No. 25-cv-7334, 2026 WL 27565, at *3 (E.D. Pa. Jan. 5, 2026) (slip

opinion) ("The fact Francois had TPS which then expired also does not impact his [habeas] petition. Courts in this district and around the country have found a petitioner's TPS status does not materially impact their right to habeas relief under similar circumstances.") (collecting cases). The termination of Mr. Hernández Lazo's TPS in September 2025 does not change the fact that he was a noncitizen who had been residing in the interior of the United States for decades at the time that ICE detained him, thereby firmly placing his detention under Section 1226(a). *See Lopez Benitez*, 795 F. Supp. 3d at 491 (discussing *Jennings*, 583 U.S. at 289).

Accordingly, Section 1225(b)(2) does not govern Mr. Hernández Lazo's detention, for all of the reasons explained above. His detention, therefore, must necessarily fall under Section 1226(a), which "authorizes the Government to detain certain aliens *already in the country pending* the outcome of removal proceedings." *Jennings*, 583 U.S. at 289 (emphasis added).[14]

## B. Procedural Due Process

The Fifth Amendment guarantees that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. When evaluating a procedural due process claim, there are "two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Radwan v. Manuel*, 55 F.4th 101, 123 (2d Cir. 2022); *see also Nnebe v. Daus*, 931 F.3d 66, 80 (2d Cir. 2019).

### i. *ICE's Detention of Mr. Hernández Lazo Infringes on his Protected Liberty Interest*

Mr. Hernández Lazo argues that ICE's detention of him infringes on his protected interest in liberty, triggering a right to procedural due process. Respondents rely on the Supreme Court's

---

[14] Respondents do not contend that Mr. Hernández Lazo is detained pursuant to 8 U.S.C. § 1225(b)(1) ("Section 1225(b)(1)") or 8 U.S.C. § 1226(c) ("Section 1226(c)"). (Hr'g Tr. 27:16–28:4, 30:6–9.)

decision in *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020), and other cases to argue that because Mr. Hernández Lazo is an applicant for admission to the United States, "'the Due Process Clause provides nothing more' than the procedural protections set forth in 8 U.S.C. § 1225." (Resp. at 10 (quoting *Thuraissigiam*, 591 U.S. at 139–40).)

Respondents advanced the same arguments in *Rodriguez-Acurio*, and this Court has already carefully considered and addressed them in ruling on the habeas petition in that action. *See Rodriguez-Acurio*, 2025 WL 3314420, at *26–27. In summary, as a preliminary matter, Mr. Hernández Lazo is not detained pursuant to Section 1225(b)(2); accordingly, his detention is governed by Section 1226(a), and he is entitled to the protections afforded by that statute—not just the procedures afforded under Section 1225(b)(2). Moreover, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. The Due Process Clause "covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent." *Velasco Lopez*, 978 F.3d at 850; *see also Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903) (noncitizen who entered the country in violation of the law cannot be "deprived of [her] liberty" without receiving "due process of law"). In habeas proceedings concerning executive detention, courts must conduct "the most searching review" to ensure the legality of detention that "occur[s] without the procedural protections required in courts of law." *Velasco Lopez*, 978 F.3d at 850–51.

*Thuraissigiam* does not support Respondents' position that Mr. Hernández Lazo has no rights to due process beyond what is afforded by Section 1225 because that decision "stands for the limited principle that those 'at the threshold of entry' stand on a different footing for due process purposes than noncitizens 'who have established connections in this country.'"

*Rodriguez-Acurio*, 2025 WL 3314420, at *26 (quoting *Thuraissigiam*, 591 U.S. at 107). Mr. Hernández Lazo has been living in the United States continuously since around January 1997. (Pet. ¶ 14; Second Petito Decl. ¶¶ 7, 12; ECF No. 18-1 at 28–29; *see also supra* note 5.) DHS granted him TPS in December 1999, and USCIS extended his TPS designation or granted Mr. Hernández Lazo's applications to re-register for TPS at least ten times, as recently as February 2024. (Second Petito Decl. ¶¶ 12– 17, 20, 27, 28, 32–35).[15] During his nearly thirty-year residence in the United States, Mr. Hernandez Lazo has developed deep community ties in this country, where his U.S. citizen daughter resides and where he works as a carpenter. (ECF No. 18-1 at 33–37.) Accordingly, the scope of Mr. Hernández Lazo's rights to procedural due process are not analogous to those of Thuraissigiam, who was stopped within 25 yards of the border. *Thuraissigiam*, 591 U.S. at 11. As addressed in *Rodriguez-Acurio*, the cases on which Respondents rely, including *Thuraissigiam*, are therefore distinguishable. 2025 WL 3314420, at *26 n.17 (distinguishing cases cited by Respondents in support of proposition that a non-citizen residing in the interior of the United States has no right to due process beyond the procedures required by Section 1225).

Respondents contend that the entry fiction applies to "aliens with sympathetic claims, including those . . . [with] significant ties to this country." (Resp. at 10.) They miss the point.

---

[15] Respondents do not argue that Mr. Hernández Lazo's brief trips abroad are material to the analysis here. But even if they did, because USCIS extended Mr. Hernández Lazo's TPS numerous times and as recently as February 26, 2024, the agency necessarily treated him as someone who had remained "continuously physically present in the United States" the entire time he had TPS notwithstanding his brief trips abroad, which were made with advance permission. *See* 8 C.F.R. § 244.15 (providing that "[a]fter the grant of Temporary Protected Status, the alien must remain continuously physically present in the United States" and that failure to obtain advance parole prior to a TPS recipient's departure from the United States may result in withdrawal of TPS).

The issue here is not whether Mr. Hernández Lazo has a "sympathetic" claim. Rather, Respondents rely on *Thuraissigiam* for the notion that Mr. Hernández Lazo has no right to due process beyond that which is provided under the terms of Section 1225(b)(2). That argument does not hold water both because Mr. Hernández Lazo's detention is governed by Section 1226(a) and because the cases on which Respondents rely, including *Thuraissigiam*, are distinguishable for the reasons explained in *Rodriguez-Acurio* and here.

Accordingly, Mr. Hernández Lazo has a liberty interest in being free from detention that is afforded procedural due process protection. ICE's detention of Mr. Hernández Lazo, which commenced on December 1, 2025, and did not end until ICE released him in response to this Court's December 12, 2025 oral order granting the Petition, necessarily infringed on that liberty interest.

### ii. Respondents Did Not Provide Mr. Hernández Lazo Adequate Notice and an Opportunity to be Heard.

Courts apply the *Mathews v. Eldridge* balancing test "when determining the adequacy of process in the context of civil immigration confinement." *Munoz Materano v. Artera*, __ F. Supp. __, No. 25-cv-6137, 2025 WL 2630826, at *12 (S.D.N.Y., Sept. 12, 2025). Under that test, a court's determination of what procedures are required under the Fifth Amendment involves considering: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used; and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Applying this balancing test, Respondents' detention of Mr. Hernández Lazo from December 1, 2025 until December 12, 2025, when ICE released him pursuant to this Court's order, violated his Fifth Amendment rights to procedural due process.

*1. Private Interest*

With respect to the first factor, Mr. Hernández Lazo invokes "the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851.

On December 1, 2025, ICE officers detained Mr. Hernández Lazo without any notice, explanation, or an opportunity to be heard, and held him in the Central Islip Hold Room and other detention facilities in New York and New Jersey, separating him from his daughter and preventing him from working as a carpenter. Before ICE suddenly arrested him in 2025, Mr. Hernández Lazo was being considered for permanent residence and adjustment of status. He had also consistently complied with the requirement of TPS to apply for approval before departing the United States for any trips abroad. (*See* ECF No. 18-1 at 52; Second Petito Decl. ¶¶ 21–31.)

While detained in the Central Islip Hold Room for around twenty-three hours, Mr. Hernández Lazo was not only deprived of his freedom, he was confined in a small, crowded room, no more than six feet by six feet,[16] shared with around five others who slept and ate next to an open toilet, used the toilet without privacy, and lacked access to proper bedding, showers, soap, toothpaste, a toothbrush, and a clean change of clothing. ICE did not permit him to speak or meet with his lawyer despite his pending habeas petition and immigration court proceedings. Moreover, although both of Mr. Hernández Lazo's periods of detention in the Central Islip Hold Room included nighttime hours, the lights in the room remained on at all times, impeding sleep.

---

[16] Mr. Hernández Lazo testified that the room in which he was detained in the Central Islip Hold Room was six feet by six feet, while Mr. Minarcaja Concha described being detained in a room that was four feet by four feet. (Hr'g Tr. 7:22–8:1; *Minarcaja Concha*, 2026 WL 215417, at *5.) The discrepancy may be explained by Mr. Minarcaja Concha's testimony that there are around four different rooms, or the fact that Mr. Hernández Lazo was detained with five other people, whereas Mr. Minarcaja Concha was detained with six or seven others. (Hr'g Tr. 8:6–13; *Minarcaja Concha*, 2026 WL 215417, at *5.)

As Judge Brown observed, the conditions in the Central Islip Hold Room violate ICE's own minimum standards for such facilities, which were established "to ensure the safe and humane treatment of detainees." *Clarke*, 2025 WL 3674471, at *7. For example, the rooms used to hold Mr. Hernández Lazo, Mr. Minarcaja Concha, and Mr. Clarke were each designed to hold a *single* detainee for several hours at a time. *Id*. at *3, *7. Yet, these rooms are being used to detain anywhere from six to *nine* detainees for extended periods of time, including periods lasting twenty-four hours or more. (*Id*.; Hr'g Tr. 8:6–10; *Minarcaja Concha*, 2026 WL 215417, at *5.) Thus, as Judge Brown observed, "ICE has been deploying its 'holding rooms' in a manner that shocks the conscience . . . it appears that the conditions maintained at the Central Islip hold room, given the recklessly expanded use of these facilities by ICE, may well violate constitutional requisites." 2025 WL 3674471, at *6.[17]

The fact that Mr. Hernández Lazo was detained in such conditions for even part of his detention by ICE underscores why freedom from detention is a precious liberty afforded protection under the Due Process Clause of the Fourteenth Amendment to our Constitution. Accordingly, ICE's detention of Mr. Hernández Lazo from December 1, 2025 through December 12, 2025—the date of this Court's order requiring his release—infringed on his weighty private interest in personal liberty.

## *2. Risk of Erroneous Deprivation*

There is a high risk of erroneous deprivation through the procedures used to detain Mr.

---

[17] Moreover, ICE's decision to house detainees overnight in the Central Islip facility appears to contravene "the Suffolk County Bargain and Sale Deed conveying the land on which the Courthouse in Central Islip [ ] sits to the federal government," which provides that "[t]he Federal Courthouse and Federal Building *shall not be designed or altered for the overnight housing and/or custody of prisoners or detainees*." (*See* Elec. Order, Dec. 8, 2025 (citing *USA v. Deonarain*, 2:25-cr-00210 (E.D.N.Y.), ECF Nos. 29 and 21-1) (emphasis added).)

Hernández Lazo. Respondents did not provide him with any notice or any opportunity to be heard before a DHS officer or immigration judge before ICE detained him on December 1, 2025. For the same reasons set forth fully in *Rodriguez-Acurio*, there is a high risk of erroneous deprivation of liberty in detaining Mr. Hernández Lazo without any notice or opportunity to be heard. *See* 2025 WL 3314420, at *29–30. There is little cost and significant benefit from providing the procedural safeguard of requiring that any detention be preceded by an individualized determination by a DHS officer as to whether Mr. Hernández Lazo poses a flight or safety risk. *See id.*; *Lopez Benitez*, 795 F. Supp. 3d at 495; *Hyppolite v. Noem*, No. 24-cv-4304, 2025 WL 2829511, at *13–14 (E.D.N.Y. Oct. 6, 2025) (finding an "extremely high" risk of erroneous deprivation where a person is detained under Section 1226(a) without any pre-deprivation notice or an opportunity to be heard).

### 3. The Government's Interest in Detaining Mr. Hernández Lazo Without a Hearing

Here, Respondents have not addressed any of the *Matthews v. Eldridge* factors, much less any government interests advanced by ICE's detention of Mr. Hernández Lazo without notice or an opportunity to be heard.

Although the Attorney General may have a legitimate government interest in ensuring the appearance of noncitizens at immigration proceedings and preventing danger to the community, there is absolutely nothing in the record showing that Mr. Hernández Lazo is a flight risk or a danger to the community or that anything has changed since his TPS was last renewed on February 26, 2024, aside from termination of that status on account of Noem's termination of TPS for all Honduran nationals. USCIS's decision to renew Mr. Hernández Lazo's TPS, therefore, necessarily involved the determination that he posed no flight or public safety risk. *See* 8 C.F.R. § 244.4(a) (rendering persons convicted of any felony or two or more misdemeanors

ineligible for TPS); 8 C.F.R. § 244.15(b) (providing that failure to obtain advance parole prior to a TPS recipient's departure from the United States may result in withdrawal of TPS); *see also Velasco Lopez*, 978 F.3d at 854 (holding that "the Attorney General's discretion to detain individuals under [Section 1226(a)] is valid where it advances a legitimate governmental purpose," such as "ensuring that noncitizen[s] do not abscond and . . . ensuring they do not commit crimes"); *Lopez Benitez*, 795 F. Supp. 3d at 496. Respondents therefore fail to demonstrate that ICE's detention of Mr. Hernández Lazo without any notice or opportunity to be heard advances *any* legitimate government interests.

* * *

Weighing all of the *Mathews v. Eldridge* factors—the significant liberty interest at stake, the high risk of erroneous deprivation, and Respondents' failure to demonstrate that Mr. Hernández Lazo's detention was required to advance any legitimate government interest in preventing danger to the community or ensuring appearance at removal proceedings— Respondents' detention of Mr. Hernández Lazo with no notice or opportunity to be heard and no showing of changed material circumstances following the most recent renewal of his TPS, violates his Fifth Amendment rights to procedural due process. *See, e.g.*, *Rodriguez-Acurio*, 2025 WL 3314420, at *25–31; *Lopez Benitez*, 795 F. Supp. 3d at 496; *Huamani Tumba v. Francis*, No. 25-cv-6065, 2025 WL 3079014, at *9 (E.D.N.Y. Nov. 28, 2025).

Because the Court finds that Respondents' detention of Mr. Hernández Lazo violates his rights to procedural due process, it declines to reach his Fifth Amendment substantive due process claim.

### III.    Remedy

As addressed at length in *Rodriguez-Acurio*, upon finding a constitutional violation, a district court "may" grant a writ of habeas corpus and "dispose of the matter as law and justice require." 28 U.S.C §§ 2241(a), 2243. Release from detention is the "typical remedy" for "unlawful executive detention." *Munaf v. Green*, 553 U.S. 674, 693 (2008).

Here, Mr. Hernández Lazo seeks a writ of habeas corpus directing Respondents to immediately release him. (Pet. at 24.) He also seeks, in the alternative, "injunctive relief ordering Respondents to immediately release Petitioner" and any "such further relief as the Court deems just and proper." (*Id.* at 24–25.)

In *Rodriguez-Acurio*, this Court provides the legal basis for ordering release from ICE detention as well as limited injunctive relief enjoining Respondents from invoking Section 1225(b) as the basis for subjecting a non-citizen habeas petitioner to mandatory detention, absent a change in relevant circumstances. *See Rodriguez-Acurio*, 2025 WL 3314420, at *31–32. Those same reasons support the grant of similar injunctive relief in addition to release in this action. A bond determination by a DHS officer or an immigration judge would not remedy the core constitutional violation at issue here. Mr. Hernández Lazo's detention was unlawful from its inception because ICE detained him under the wrong statute and without any notice or opportunity to be heard, much less the procedures required under Section 1226(a). Accordingly, "dispos[ing] of the matter as law and justice require," 28 U.S.C. § 2243, necessitates both release and narrow injunctive relief guarding against re-detention in violation of this Court's determination that Mr. Hernández Lazo is not subject to mandatory detention under Section 1225(b). *Martinez v. McAleenan*, 385 F. Supp. 3d 349, 373 (S.D.N.Y. 2019) ("As Petitioner's arrest and detention were blatantly unlawful from the start, the only commensurate and

appropriate equitable remedy to even partially restore Plaintiff is to immediately release him and enjoin the Government from further similar transgressions" against him).[18]

## CONCLUSION

For the reasons explained above and in *Rodriguez-Acurio*, the habeas petition is granted as to its request for a writ of habeas corpus under 28 U.S.C. §§ 2241, 2243 seeking Mr. Hernández Lazo's immediate release from detention. Pending the issuance of any final removal order against Mr. Hernández Lazo, Respondents are enjoined from denying him bond in any subsequent proceeding on the basis that he must be detained pursuant to 8 U.S.C. § 1225(b), absent a change in relevant circumstances consistent with this Opinion and Order.

Because Mr. Hernández Lazo withdrew his civil action claims for injunctive and declaratory relief, those claims are dismissed without prejudice. (ECF No. 21.) The schedule for briefing Defendants' motion to dismiss the civil action claims is therefore terminated. (*See* Elec. Order, Dec. 12, 2026.) This action remains held in abeyance.

Dated: Central Islip, New York
      February 4, 2026

                                           */s/ Nusrat J. Choudhury*
                                           NUSRAT J. CHOUDHURY
                                           United States District Judge

---

[18] As in *Rodriguez-Acurio*, this limited grant of injunctive relief to guard against re-detention by ICE without a bond hearing on the basis of Section 1225(b)(2) absent a change in relevant circumstances is necessary to ensure that the release of Mr. Hernandez Lazo is not rendered meaningless. Accordingly, this narrow injunctive relief falls within the "core of habeas." *Thuraissigiam*, 591 U.S. at 119.